585 A.2d 204

Johnny **EVANS**

v.

**STATE of Maryland.**

**No. 81, Sept. Term, 1988.**

Court of Appeals of Maryland.

Feb. 6, 1991.

George M. Lipman, Asst. Public Defender and George E. Burns, Jr., Asst. Public Defender (Alan H. Murrell, Public Defender, on brief), Baltimore, for petitioner.

Kreg Paul Greer, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., both on brief), Baltimore, for respondent.

Argued Feb. 2, 1989 before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

Reargued Jan. 3, 1991 before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI, JJ., and CHARLES E. ORTH, Jr. (Judge of the Court of Appeals of Maryland, retired, specially assigned).

McAULIFFE, Judge.

Johnny Evans was charged with murder and related offenses in connection with the slaying of a disc jockey at a Baltimore City nightclub. According to eyewitnesses, Evans left the club after having been involved in a fight with several of the club's employees, but returned with a sawed-off shotgun which he used to kill the disc jockey.

Evans entered pleas of "not guilty" and "not criminally responsible by reason of insanity." The sole expert proffered by Evans in support of his plea of not criminally responsible was Doctor Maxie Collier, a board certified psychiatrist. Immediately prior to trial, defense counsel offered the testimony of Dr. Collier "on the threshold question of sanity." [1]

Dr. Collier testified that in his opinion Evans was suffering from an amnesic episode at the time of the shooting; that the amnesic episode amounted to a mental disorder; and, that as a result of this mental disorder, Evans lacked substantial capacity to appreciate the criminality of his conduct or to conform that conduct to the requirements of law. The State conceded that Dr. Collier was generally qualified to express an opinion on the question of criminal responsibility, but argued that in this case the foundation for the opinion, as revealed by Dr. Collier's testimony, was deficient. Judge Kathleen O'Ferrell Friedman agreed with

---

1. Evans now argues that the trial judge should not have conducted a threshold inquiry concerning the adequacy of the defendant's evidence to generate a question of criminal responsibility. He concedes that this procedure has been followed in this State since the Court of Special Appeals decided *Strawderman v. State*, 4 Md.App. 689, 244 A.2d 888 (1968) and *McCracken v. State*, 2 Md.App. 716, 237 A.2d 87 (1968), but contends that a 1984 change in the Maryland law of criminal responsibility removed the necessity for a threshold inquiry. We do not address this argument because no objection was made in the trial court, and no issue concerning the procedure was raised in the Court of Special Appeals. Indeed, in his brief filed in the intermediate appellate court, Evans conceded that "the trial court's task is to determine preliminarily whether the proof offered is sufficient to raise a doubt as to the sanity of the accused in the minds of reasonable men."

the State, and held the defendant's evidence insufficient to generate the issue of criminal responsibility.

At the jury trial that followed, Evans was convicted of manslaughter and of the use of a handgun in the commission of a crime of violence. He appealed, and the convictions were affirmed by the Court of Special Appeals in an unreported opinion.[2] We granted Evans's petition for certiorari, and we now affirm.

■ We hold that the trial judge properly excluded the proffered testimony of Dr. Collier, because there was no legally sufficient foundation to support the doctor's opinion that the defendant suffered from a "mental disorder" within the meaning of § 12–108 of the Health–General Article, Maryland Code (1982, 1990 Repl.Vol.). Additionally, even if we assume that the testimony of Dr. Collier may have been admissible on the separate question of the defendant's ability to form the requisite criminal intent, it was not offered on that basis.

Evans related the following story to Dr. Collier. On the evening of 3 January 1986, Evans went to his girlfriend's home in Baltimore City. There, he smoked three marihuana cigarettes and shared two pints of vodka with two other persons. He then went to a "disco" nightclub where he was involved in an argument with a club bouncer. At Evans's suggestion, he and the bouncer went outside to settle the dispute. The bouncer, however, did not go alone. He was accompanied by other club employees, and together they got the better of Evans. After having been beaten, the defendant walked away, feeling "dazed" and "out of it." Evans claims his mind then went blank, and he could not recall anything until several hours later when he was at his home, suffering from a severe headache.

---

**2.** The Court of Special Appeals also considered the issue of whether the trial court erred in refusing to grant petitioner's request for a continuance to secure testimony of an alibi witness, holding that it did not. That issue is not before us.

Dr. Collier learned from other sources that a short time after leaving the nightclub, Evans returned, brandishing a sawed-off shotgun. After firing the shotgun into the air at least twice, Evans walked alone across the parking lot, opened the door of the nightclub and, while holding the door open with his foot, shot and killed one of the club employees with whom he had fought. Evans then turned and walked hurriedly from the scene.

Dr. Collier also received the following history concerning Evans: chronic antisocial behavior with several periods of incarceration; an earlier diagnosis of psychopathic personality; lead poisoning during childhood; a previous stab wound to the head; head trauma from being pistol whipped three to four months before the incident; and, persistent headaches in the right temporal area. The defendant denied previous blackouts, but claimed occasional dizzy spells. Dr. Collier found no evidence of any major thought disorder, though he did note some tangential thought association. Reality testing was intact, and the defendant's affect was common and detached. Recent psychological testing by another doctor disclosed no evidence of cognitive dysfunction that could be associated with significant central nervous system impairment.

From this information, gained by reviewing reports and by interviewing the defendant for 1½ hours, Dr. Collier concluded that Evans had suffered an amnesic episode, which began when the defendant was walking away from the nightclub and continued several hours until the defendant was at his home. Dr. Collier opined that this amnesic episode involved a loss of consciousness—that the defendant did not know what he was doing, had no cognitive abilities, and thus was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.

Dr. Collier equated this condition to that of a person in a coma, or under anesthesia, or delirious from fever, or in the midst of an epileptic seizure, or even sleepwalking. It is difficult to tell from the record exactly what reasoning the

psychiatrist employed in reaching the conclusion that Evans was essentially unconscious when he left the nightclub, obtained a shotgun, and returned to kill the victim. It would appear that his reasoning proceeded along these lines: Evans says that he didn't remember anything that happened during that period of time; if he didn't remember, he must not have been able to perceive; if he could not perceive, he was not conscious; if he was not conscious, he was suffering an amnesic episode. Dr. Collier testified:

> Based upon my examination of this man, if he has no recollection of those events, then I can only say he was not responsible.

The trial judge wanted to be sure she understood what the doctor had said:

> JUDGE: Are you saying then that every time that somebody does not remember an incident, that they are not conscious at the time that the incident took place?
>
> DR. COLLIER: If it is, yes, I am. If there is no awareness of something then one is not conscious.
>
>      \*     \*     \*     \*     \*     \*
>
> JUDGE: Well, the question is: just because someone doesn't remember, does that necessarily mean that the person wasn't conscious of the conduct at the time?
>
> DR. COLLIER: I would say yes, it does.
>
>      \*     \*     \*     \*     \*     \*
>
> JUDGE: And you are saying that you think lack of memory is equivalent to unconsciousness at the time that conduct takes place?
>
> DR. COLLIER: That is correct.

On redirect examination, however, defense counsel led Dr. Collier to a less strident position. He asked whether the inability to remember someone's name years after meeting that person meant that one was legally insane at the time of the meeting. The psychiatrist said no. He explained:

> That means that the memory of your name has become, that data has become unconscious. That's the reason

there is no memory of it. That data has become unconscious.

■ Assuming that the evidence of potentially predisposing circumstances coupled with the known trauma of a beating immediately before the claimed alteration of consciousness and a history of no recollection of events during the time in question may be sufficient to support the diagnosis of amnesic episode, the question remains whether there is any evidence of a mental disorder within the meaning of the Maryland test for criminal responsibility.[3]

Section 12-108 of the Health–General Article sets forth the test for criminal responsibility in Maryland:

(a) *Test—In general.*—A defendant is not criminally responsible for criminal conduct if, at the time of that conduct, the defendant, because of a mental disorder or mental retardation, lacks substantial capacity:

(1) To appreciate the criminality of that conduct;  or

(2) To conform that conduct to the requirements of law.

(b) *Same—Exclusion.*—For purposes of this section, "mental disorder" does not include an abnormality that is manifested only by repeated criminal or otherwise antisocial conduct.

Section 10-101(h) of the Health–General Article defines "mental disorder":

(1) "Mental disorder" means a behavioral or emotional illness that results from a psychiatric or neurological disorder.

(2) "Mental disorder" includes a mental illness that so substantially impairs the mental or emotional functioning of an individual as to make care or treatment necessary

---

**3.** We have previously held that amnesia, by itself, does not render an accused incompetent to stand trial. *Morrow v. State,* 293 Md. 247, 253, 443 A.2d 108 (1982). Moreover, it is generally recognized that amnesia, in and of itself, is not a defense to a criminal charge. *See State v. Caddell,* 287 N.C. 266, 215 S.E.2d 348, 360 (1975). Additionally, see the cases collected in the Annotation, *Amnesia as Affecting Capacity to Commit Crime or Stand Trial,* 46 A.L.R.3d 544, 551–52 (1972).

or advisable for the welfare of the individual or for the safety of the person or property of another.

(3) "Mental disorder" does not include mental retardation.

We conclude that the condition of "amnesic episode" described by Dr. Collier in this case was not shown to be a mental disorder because it was not shown to be a mental, behavioral, or emotional *illness* within the meaning of § 10–101(h). It is, at least as described in this case, a medical condition. Dr. Collier so testified:

PROSECUTOR: What medical diseases did you find the defendant has?

DR. COLLIER: The medical diseases? The medical condition [is] as reflected in my assessment.

PROSECUTOR: The diseases he had is?

DR. COLLIER: He suffers from amnesic condition.

PROSECUTOR: Is that a disease, Dr. Collier?

DR. COLLIER: That is the medical condition.

Evans offered no evidence that the "amnesic episode" allegedly suffered by him, or the underlying condition producing that episode in this case, is generally accepted by the scientific community as a mental disorder. It is worthy of note, though not dispositive of the question of the existence of a mental disorder, that the condition described by Dr. Collier is not listed in the Diagnostic and Statistical Manual of Mental Disorders (3d ed.) (DSM III).

There may be a problem of semantics here. Dr. Collier labeled Evans's condition as amnesia. Ordinarily, amnesia refers to a disturbance, loss, or lack, of memory. Under the circumstances of this case, amnesia would seem to be a sequela of the condition of altered consciousness, and not the condition itself. The condition of "amnesic episode" that Dr. Collier described, and upon which he relied to form his opinion that Evans lacked cognitive ability at the time of shooting, may approach what has been described by others as automatism. See the cases collected in the Annotation, *Automatism or Unconsciousness as Defense to Criminal*

*Charge,* 27 A.L.R.4th 1067 (1984). Additionally, see Fox, *Physical Disorder, Consciousness, and Criminal Liability,* 63 Colum.L.Rev. 645 (1963). The Supreme Court of Wyoming explained automatism in these words:

> Automatism is the state of a person who, though capable of action, is not conscious of what he is doing. While in an automatistic state, an individual performs complex actions without an exercise of will. Because these actions are performed in a state of unconsciousness, they are involuntary. Automatistic behavior may be followed by complete or partial inability to recall the actions performed while unconscious. Thus, a person who acts automatically does so without intent, exercise of free will, or knowledge of the act.

*Fulcher v. State,* 633 P.2d 142, 145 (Wyo.1981). The same Court pointed out that "[a]utomatism may be caused by an abnormal condition of the mind capable of being designated a mental illness or deficiency" or it "may also be manifest in a person with a perfectly healthy mind." *Id.*

In W. LaFave & A. Scott, *Substantive Criminal Law,* § 4.9 (1986), the authors distinguish automatism from insanity:

> A defense related to but different from the defense of insanity is that of unconsciousness, often referred to as automatism: one who engages in what would otherwise be criminal conduct is not guilty of a crime if he does so in state of unconsciousness or semi-consciousness.

In *People v. Martin,* 87 Cal.App.2d 581, 197 P.2d 379, 383 (1948), the court said: "[t]he defense of insanity is one thing, and the defense of unconsciousness is another." To the same effect, see *State v. Caddell,* 287 N.C. 266, 285, 215 S.E.2d 348, 360 (1975); *State v. Weatherford,* 416 N.W.2d 47, 54 (S.D.1987); *Jones v. State,* 648 P.2d 1251, 1257–58 (Okla.Crim.1982), *cert. denied,* 459 U.S. 1155, 103 S.Ct. 799, 74 L.Ed.2d 1002 (1983). Other courts hold that the loss of cognitive ability resulting from a condition such as epilepsy is available as a defense in a criminal case as an "insanity" or lack of criminal responsibility defense. *See, e.g., Tibbs v.*

*Commonwealth*, 138 Ky. 558, 128 S.W. 871 (1910); *State v. Wilson*, 85 N.M. 552, 514 P.2d 603 (1973); *People v. Higgins*, 5 N.Y.2d 607, 186 N.Y.S.2d 623, 159 N.E.2d 179 (1959); *Cook v. State*, 271 So.2d 232 (Fla.App.1973); *Starr v. State*, 134 Ga.App. 149, 213 S.E.2d 531 (1975). The latter approach is sometimes favored because the defendant is required to interpose a plea of "insanity," thus giving reasonable notice to the State of the contention being made; and, because treatment, where appropriate, can be required after a finding that the defendant committed the offense but is not criminally responsible.

We need not decide here whether a plea of "not criminally responsible by reason of insanity" is an absolute prerequisite to the introduction of evidence of automatism as a defense in a criminal case. Evans did file such a plea, and the evidence was prohibited only because the foundation set forth by his expert did not support the conclusion that Evans lacked cognitive ability as a result of a mental disorder.

Dr. Collier expressed the opinion that the most likely cause of the defendant's amnesic state was substance abuse. He thought it possible that the effects of trauma sustained in the beating outside the bar also contributed to the condition, but in the absence of objective evidence of damage to the central nervous system, he could not state that as a probability. Dr. Collier's testimony was:

Well, I say that he experienced amnesic episode most likely secondary to substance abuse.

\*　　\*　　\*　　\*　　\*　　\*

I go on the premise of the substance abuse disorder, but the neurological condition is still absolutely not ruled out.

\*　　\*　　\*　　\*　　\*　　\*

Well, as I said, I am giving you my opinion as to substance abuse as being the cause of this amnesic condition.

Dr. Collier said it was possible that the earlier trauma to the head resulted in "scarring to the brain, such as there may have been a condition of epilepsy," but in the absence of an electroencephalogram or "CAT" scan he could not state that as a probability.

Evans concedes that "[a]n expert's judgment has no probative force unless there is a sufficient basis upon which to support his conclusions." *Bohnert v. State*, 312 Md. 266, 275, 539 A.2d 657 (1988), quoting *Worthington Constr. v. Moore*, 266 Md. 19, 29, 291 A.2d 466 (1972). He contends, however, that the adequacy of the basis for the opinion goes only to the weight to be given the testimony, and that consequently a trial judge must permit a qualified expert to express an opinion about any matter within the expert's field. Evans is wrong.

In *State Health Dep't v. Walker*, 238 Md. 512, 209 A.2d 555 (1965), we dealt with the question of when, and under what circumstances, a witness deemed to be an expert may express an opinion in the field of his or her expertise. We said:

> An expert opinion derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert. *Doyle v. Rody*, 180 Md. 471, 25 A.2d 457. The premises of fact must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown. *State, Use of Stickley v. Critzer*, 230 Md. 286, 186 A.2d 586, and cases cited therein; *Hammaker v. Schleigh*, 157 Md. 652, 147 Atl. 790. The opinion of an expert, therefore, must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support such conclusion. The facts upon which an expert bases his opinion must permit reasonably accu-

rate conclusions as distinguished from mere conjecture or guess. *Marshall v. Sellers,* 188 Md. 508, 53 A.2d 5. *Id.* 238 Md. at 520, 209 A.2d 555. Professor McLain sums it up in this fashion:

> The expert's opinion is of no greater value than the soundness of the reasons given for it will warrant. If no adequate basis for the opinion is shown, the opinion should not be admitted or, if already admitted, should be stricken. (Footnotes omitted.)

L. McLain, *Maryland Evidence* § 705.1 (1987). In the case before us, the foundation facts and reasons advanced by Dr. Collier were insufficient to support his opinion that Evans suffered from a "mental disorder" within the meaning of the Maryland law relating to criminal responsibility, and the trial judge did not err in refusing to admit the opinion.

JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED, WITH COSTS.